UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CARGILL, INCORPORATED,                          :
                                                :
                Plaintiff,     :
                                                :    OPINION & ORDER
      -against-                            :
                                                :    12 Civ. 7042 (HB)
INTERNATIONAL EXCHANGE                          :
SERVICES, LLC,                                  :
                                                :
                Defendant.     :
------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

      Plaintiff Cargill, Incorporated ("Cargill") has sued defendant International Exchange Services, LLC ("IES") for the transfer of invalid renewable fuel credits, referred to as Renewable Identification Numbers ("RINs"), which Cargill purchased in order to meet its own obligations under the Clean Air Act. Before the Court is IES's motion to dismiss the Complaint. For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

      Under the Clean Air Act ("CAA") and regulations issued by EPA governing the Renewable Fuel Standard Program, certain obligated parties may sell gasoline that contains an applicable percentage of renewable fuel only; the Renewable Volume Obligation ("Volume Obligation"). A renewable fuel can be loosely defined as a non-petroleum based fuel, such as biogas or ethanol. The Renewable Fuel Standard Program is described in great detail in several other cases. *See, e.g.*, *GP & W, Inc. v. Int'l Exch., Services, LLC*, No. 4:12CV00404 ERW, 2012 WL 4513851, at *1 (E.D. Mo. Oct. 2, 2012); *Vinmar Overseas, Ltd. v. OceanConnect, LLC*, No. CIV.A. H-11-4311, 2012 WL 3599486, at *1–2 (S.D. Tex. Aug. 20, 2012); *Lansing Trade Group, LLC v. OceanConnect, LLC*, No. 12-2090-JTM, 2012 WL 2449514, at *1 (D. Kan. June 26, 2012).

      Cargill asserts three causes of action: (1) a citizen suit for a violation of the CAA; (2) a breach of contract for the alleged sale of invalid RINs; and (3) a breach of the implied warranties under the UCC.

**DISCUSSION**

IES moves to dismiss Claim I for lack of subject-matter jurisdiction and Claims II and III for failure to state a claim. FED. R. CIV. P. 12(b)(1), (6). Dismissal under Rule 12(b)(1) is proper "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Where subject-matter jurisdiction is contested, courts are permitted to look to materials outside the pleadings, including affidavits. *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004). The plaintiff asserting subject-matter jurisdiction has the burden of proving by a preponderance of the evidence that such jurisdiction exists. *See Makarova*, 201 F.3d at 113. To survive a Rule 12(b)(6) motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When a defendant moves to dismiss for lack of subject-matter jurisdiction and also moves to dismiss on other grounds, the court must consider the Rule 12(b)(1) motion first. *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd sub nom. Baldessarre ex rel. Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, No. 11-2835-CV, 2012 WL 4039986 (2d Cir. Sept. 14, 2012) (unpublished decision).

**I.      Citizen Suit**

Under the CAA, any person may commence a civil action on his own behalf "against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter . . . ." 42 U.S.C. § 7604(a)(1). There are no disputed issues of fact that are central to both subject-matter jurisdiction and the claim on the merits: IES is a "person"; Cargill alleges a violation of an "emission standard or limitation"; and IES, as a commodities trader, is not an obligated party under the regulations. Cargill alleges that IES is currently "in violation" of the CAA by failing

"to correct the transfer of invalid RINs" to Cargill. *See* 40 C.F.R. §§ 80.1131(b)(3), 80.1431(b)(3)).[1]

The section of the regulations that Cargill seeks to rely on is titled "Treatment of Invalid RINs". *Id.* § 80.1131. Subsection (a) describes the various circumstances under which a RIN is to be considered "invalid", and subsection (b) details additional provisions that apply "[i]n the case of RINs that are invalid". *Id.* And § 80.1131(b)(3) reads in full: "Any valid RINs remaining after deleting invalid RINs must first be applied to correct the transfer of invalid RINs to another party before applying the valid RINs to meet the party's Renewable Volume Obligation at the end of the compliance year." I am unaware of any case interpreting this sentence.

The parties dispute whether a person who transfers invalid RINs but who does not have a Volume Obligation has a duty, after deleting invalid RINs, to correct the transfer with remaining valid RINs. In Cargill's view, the limiting language—"before applying the valid RINs to meet the party's Renewable Volume Obligation"—does not limit to whom the regulations apply. For support, Cargill cites general statements by EPA about liability for transferring invalid RINs and for using invalid RINs for compliance with the Volume Obligation even where the RINs were purchased in good-faith. *See* Regulation of Fuels and Fuel Additives: 2012 Renewable Fuel Standards, 77 Fed. Reg. 1320, 1345 ("EPA is not making any changes to the liability sections of RFS2 as a result of these comments and although today's rule will allow obligated parties to use some invalid RINs for compliance, the obligated parties and any intermediary party are still liable for buying and/or transferring invalid RINs."); *see also* Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900, 23950–51 ("Although an obligated party may be liable for a violation if it uses invalid RINs for compliance purposes, we normally will look first to the generator or seller of the invalid RINs both for payment of penalty and to procure sufficient valid RINs to offset the invalid RINs. However, if EPA is unable to obtain relief from that party, attention will turn to the obligated party who may then be required to obtain sufficient valid RINs to offset the invalid RINs.").

EPA, to my knowledge, has not indicated how it would interpret § 80.1131(b)(3) in the case of a non-obligated market participant who transfers invalid RINs. While certainly relevant, these statements by EPA, contrary to Cargill's reading, have not "foreclosed the distinction

---

[1] Subpart M, beginning with § 80.1400, applies for all renewable fuel produced or RINs generated on or after July 1, 2010. The RINs in this case fall under Subpart K, beginning with § 80.1100. The two subparts are virtually identical with respect to the sections discussed in this Opinion and Order, but I cite to Subpart K throughout.

between regulated parties and intermediaries". Pl.'s Opp'n 7. Interpreting § 80.1131(b)(3) either way—to reach both obligated and non-obligated parties or to reach only obligated parties—is compatible with the trading scheme that EPA established. A party who transfers invalid RINs violates § 80.1160(b)(2). An obligated party who uses invalid RINs to meet its Volume Obligation violates § 80.1160(c). Yes, EPA has said that it will "look first to the generator or seller of the invalid RINs . . . to procure sufficient valid RINs", 72 Fed. Reg. at 23950–51, but simply because EPA looks to the seller before the buyer, not every seller must be required to correct the transfer. It means only that where EPA is "[]able to obtain relief from that party", *id.*, EPA will look there before turning its attention down the commodity chain to the obligated party who had the misfortune to try to retire the invalid RINs.

Cargill also invokes what it views as the policy rationales underlying the renewable fuel program and the market for tradeable RINs. In short, Cargill argues that IES would end up with a windfall if it is not required to correct the transfer. *See* Pl.'s Opp'n 8. But again, the policy behind the renewable fuel program, which for our purposes is simply to "ensure gasoline sold or introduced into commerce in the United States . . . contains the applicable volume of renewable fuel", 42 U.S.C. § 7545(o)(2)(A)(i), does not help us interpret § 80.1131(b)(3). I am not in the business of deciding which method of enforcement produces compliance at least cost or most effectively, or which method best achieves the larger goals of energy security and greenhouse gas reduction. It is enough that IES does not end up with a windfall where, as EPA explicitly recommended, private parties are free to allocate by contract any risk of a subsequent determination by EPA that the RINs are invalid.[2] The structure of the regulations actually causes me to lean towards IES's interpretation—EPA exercises its oversight of the RIN scheme in large part through monitoring the application of RINs to regulated entities' Volume Obligations. Rather than seek out valid RINs held by parties who have no Volume Obligation, EPA may simply have decided to let obligated parties come to the agency. If that party has transferred invalid RINs, EPA then requires the transfer to be corrected before accepting valid RINs for that party's own obligation. Otherwise, EPA leaves private parties to their own devices to sort the

---

[2] *See* Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900, 23,950 ("[O]bligated parties and RIN brokers should use good business judgment when deciding whether to purchase RINs from any particular seller and should consider including prudent business safeguards in RIN transactions, such as requiring RIN sellers to sign contracts with indemnity provisions to protect the purchaser in the event penalties are assessed because we find the RINs are invalid. Similarly, parties that sell RINs should take steps to ensure any RINs that are sold were properly created to avoid penalties that result from the transfer of invalid RINs.").

rest out in the open market. This does not create windfalls; and EPA is still capable of ensuring that gasoline contains the applicable volume of renewable fuel.

In the end, all we are really left with is the text itself: "Any valid RINs remaining after deleting invalid RINs must first be applied to correct the transfer of invalid RINs to another party before applying the valid RINs to meet the party's Renewable Volume Obligation at the end of the compliance year." 40 C.F.R. § 80.1131(b)(3). The structure of the sentence and its location next to two other provisions aimed at regulated entities allows for just one interpretation—a party is obligated to correct the transfer of invalid RINs only when that party attempts to apply valid RINs towards its own Volume Obligation. The words *first* and *before* working together suggest the sentence is to be read as a whole, not piecemeal in the manner Cargill prefers. The subordinating conjunction *before* and its attendant clause clarify and situate the main, independent clause. The sentence could also be worded: Before applying the valid RINs to meet the party's Volume Obligation, any valid RINs remaining after deleting invalid RINs must first be applied to correct the transfer of invalid RINs to another party. Simply put, if you are not applying RINs to meet your Volume Obligation, § 80.1131(b)(3) is not applicable.

Furthermore, the neighboring subsections are largely aimed at obligated parties. *See* 40 C.F.R. § 80.1131(b)(1)–(2) ("(1) Invalid RINs cannot be used to achieve compliance with the Renewable Volume Obligation of an obligated party or exporter, regardless of the party's good faith belief that the RINs were valid at the time they were acquired. (2) Upon determination by any party that RINs owned are invalid, the party must adjust their records, reports, and compliance calculations as necessary to reflect the deletion of the invalid RINs."). Non-obligated parties do have record keeping and reporting obligations regarding their participation in the RIN market, though not compliance calculations. *See, e.g.*, 40 C.F.R. §§ 80.1151(d), 80.1152(c). But unlike subsection (b)(3), subsection (b)(2) states explicitly that "any party" must adjust their records. Subsection (b)(3) applies to "any valid RINs remaining", but only when an attempt is made to apply them to the seller's Volume Obligation first. If the seller has no Volume Obligation, subsection (b)(3) is silent and does not establish a priority between correcting the transfer and taking some other action, such as selling the valid RINs to another party who is willing to pay more than whatever other regulatory or contractual liability might ensue.

In other words, a market participant who has no Volume Obligation has no duty under this regulation to correct the transfer. Because Cargill has failed to properly allege that IES either

repeatedly violated or is in violation of the regulations, Cargill's claim brought under the citizen suit provision of the CAA must be dismissed. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64–67 (1987).[3]

## II.     Breach of Contract

For the breach of contract claim, IES argues that the trading scheme puts the entire risk of transferring invalid RINs on the buyer. EPA does hold obligated parties liable for failing to meet their Volume Obligations notwithstanding their good-faith purchase of RINs later deemed to be invalid. But as mentioned above and in other cases, EPA's "buyer beware" approach "is aimed at compliance with the Renewable Fuel Standard and not the terms of a contract between private parties to a RIN transaction." *GP & W, Inc. v. Int'l Exch., Services, LLC*, No. 4:12CV00404 ERW, 2012 WL 4513851, at *3 (E.D. Mo. Oct. 2, 2012); *see also Lansing Trade Grp., LLC v. OceanConnect, LLC*, No. 12-2090-JTM, 2012 WL 2449514, at *3–4 (D. Kan. June 26, 2012).

To satisfy its pleading obligations on the breach of contract claim, Cargill must allege "[1] the existence of a contract, [2] the plaintiff's performance pursuant to that contract, [3] the defendant['s] breach of [its] obligations pursuant to the contract, and [4] damages resulting from that breach." *Elisa Dreier Reporting Corp. v. Global Naps Networks, Inc.*, 84 A.2d 122, 127 (N.Y. App. Div. 2011). With respect to the breach—the only disputed element on this motion—it is enough that Cargill has alleged "IES failed to deliver to Cargill the agreed upon number of valid RINs" because "1,190,895 of these RINs . . . were not valid RINs". Am. Compl. ¶¶ 20, 30; *see also GP & W, Inc. v. Int'l Exch., Services, LLC*, No. 4:12CV00404 ERW, 2012 WL 4513851, at *4 (E.D. Mo. Oct. 2, 2012) (accepting plaintiff's pleaded allegation of a contract for the delivery of "marketable and valid RINs"); *George E. Warren Corp. v. OceanConnect LLC*, No. 2:12-cv-14125-KMM (S.D. Fla. July 25, 2012) (order denying motion to dismiss under New York law).

## III.    Implied Warranties

Several district courts have already explored at great length the applicability of the various versions of the Uniform Commercial Code to the sale of RINs, and each has determined, including one under New York law, that separated RINs are not "goods" within the meaning of the UCC. *See* N.Y. U.C.C. § 2-102; *see also GP & W, Inc.*, 2012 WL 4513851, at *4–6; *George*

---

[3] The Court retains jurisdiction as there is complete diversity of citizenship between Cargill and IES. *See* Am. Compl. ¶ 5.

*E. Warren Corp.*, No. 2:12-cv-14125-KMM (S.D. Fla. July 25, 2012); *Lansing Trade Grp., LLC*, 2012 WL 2449514, at *4–5. I agree with these cases that a separated RIN is closer to a chose, or thing, in action.

Cargill attempts to minimize the persuasiveness of these cases and argues that the courts misunderstood the nature of a RIN. Cargill characterizes a separated RIN as "inextricably tied" to the renewable fuel that was used to generate the RIN. Pl.'s Opp'n 13. No one disputes that a RIN must continue to represent renewable fuel, otherwise it becomes an "invalid RIN". 40 C.F.R. § 80.1131(a)(6). But this does not mean the tradeable, separated RIN is not still essentially informational in nature. For example, if renewable fuel that gave rise to a RIN is contaminated, spilled, or otherwise disposed of, the originally associated RIN remains valid. However, "the owner of the renewable fuel must retire a number of RINs corresponding to the volume of spilled or disposed of renewable fuel". 40 CFR § 80.1432; *accord id.* § 80.1132(b). This allows for EPA to ensure that the required volume of renewable fuel enters the market while at the same time respecting the "termination of the assignment of the [separated] RIN to a volume of renewable fuel." 40 C.F.R. §§ 80.1129(a)(1); 80.1429(a)(1).

## CONCLUSION

I have considered the parties' other arguments and find them without merit. IES's motion to dismiss is granted in part: Claims I and III are dismissed. The motion is otherwise denied. The Clerk of Court is instructed to close the open motion and remove it from my docket.

SO ORDERED.

Date: 1/8/13
New York, New York

HAROLD BAER, JR.
United States District Judge